# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D18-389

_____

CONVERGENT TECHNOLOGIES, INC.,

    Appellant,

    v.

JASPER STONE, KURT A. BERNARD, PAUL R. HUTCHINSON, and MICHAEL D. FLEMING,

    Appellees.

CORRECTED PAGES: pg 2, 4, 6, 7, and 11
CORRECTIONS ARE UNDERLINED IN RED
MAILED: November 15, 2018
BY: FTA

_____

On appeal from the Circuit Court for Escambia County.
John L. Miller, Judge.

November 13, 2018

PER CURIAM.

Appellant, Convergent Technologies, Inc. ("CTI"), the plaintiff below, appeals the trial court's Decision and Order Granting Motion for Summary Judgment, which entered final summary judgment in favor of Appellees, defendants below, in a lawsuit alleging breaches of non-solicitation agreements. Having considered the depositions, affidavits, and other materials of record in a light most favorable to CTI as the non-moving party, *see Brookie v. Winn-Dixie Stores, Inc.*, 213 So. 3d 1129, 1131 (Fla. 1st DCA 2017), we conclude that the trial court erred in entering summary judgment, and reverse.

# I.

CTI provides cyber-security training both as a prime contractor and subcontractor with the United States government. George Dands is CTI's president.

Acting in the latter capacity in 2010, CTI entered into a subcontract with Telecommunications Systems, Inc. ("TCS"), to provide instructors for a Joint Cyber Analysis Course ("JCAC"), a beginner's level cyber-security program for Navy personnel at Cory Field in Pensacola, Florida. Over the course of three years, CTI hired Appellees Paul Hutchinson, Kurt Bernard, Jasper Stone, and Michael Fleming as instructors for the JCAC job. Each appellee signed an employment contract with CTI that contained a non-solicitation clause. Although CTI refined the wording of the clauses over the years as each Appellee was hired, the following clause contained in Paul Hutchinson's contract—the first hire—conveys the gist of the other non-solicitation agreements:

> In accordance with contract guidelines, I also agree that I will not solicit employment with any other company associated with the JCAC contract during the customer review period, full-time employment period, or a six month post employment [sic] period.

In his affidavit, George Dands claimed that CTI required Appellees to execute the non-solicitation agreements primarily for the following four reasons: (1) the considerable resources expended in recruiting and "on-boarding" Appellees for the JCAC project; (2) the fact that Appellees would be managed remotely from CTI's Maryland headquarters; (3) the significant training expense and time CTI would incur in replacing Appellees on the project; and (4) the fact that CTI's relationship with TCS required the non-solicitation agreements as "a term of employment."

Along with CTI, TCS had a number of other subcontractors to support its efforts on the JCAC contract. One of the other subcontractors was Epsilon, Inc. ("Epsilon"). Under the terms of the contract between TCS and CTI, the companies agreed they would not solicit or hire each other's employees who provided services under the JCAC contract. There was no similar agreement between CTI and Epsilon, or between it and any of the other

2

subcontractors on the JCAC job. That fact served as the proverbial "crack in the door" through which slid employment negotiations between Appellees and Epsilon. In light of the non-solicitation clauses, the crux of the motion for summary judgment was who solicited whom for employment.

In his affidavit, Christopher Gaukel asserted that prior to March 2016, he worked for Epsilon as the lead instructor and considered himself to be "work friends" with Paul Hutchinson. Gaukel stated that Hutchinson told him he was frustrated with, and had concerns about, his employment with CTI regarding pay rates, health insurance, training courses, and the "complete lack of response and communication from CTI senior management and its owner, George Dands." Gaukel "encouraged" Hutchinson to "reach out" to Keith Pabst, TCS's project manager on the JCAC project.

In addition, around September 2013, Gaukel informed Peter Penzell—Epsilon's Chief Executive Officer—about "some of the issues employees with CTI were having with CTI's management," based on his conversations with Hutchison. Gaukel told Hutchinson that Penzell might contact him about a potential employment opportunity with Epsilon. Hutchinson told Gaukel he would be "interested in taking the call."

In his affidavit, Penzell explained that problems with management, such as Hutchinson had described, "could cause employees to resign," a "situation" that might "adversely affect the ability of TCS and the subcontractors to continue to provide and deliver to the United States government the high level of instructor services required under the JCAC Contract." Accordingly, Penzell said he called Keith Pabst, who—without naming names—"confirmed that the four CTI employees were very unhappy and that CTI had been unresponsive" to their concerns. Penzell added that Pabst had "noted that each of the CTI employees had come to him about their problems and concerns, including lack of communication, unpaid expense report costs, lack of training, lapses in health insurance benefits and other discrepancies, including improper 401K contributions and matching." When Penzell asked Pabst whether TCS would fill the positions if the CTI employees resigned, Pabst informed him that

3

the provisions in the contract between CTI and TCS prohibited each company from hiring the other's employees. Penzell responded, "'Nothing prevents me from hiring these guys.'" Accordingly, Penzell contacted his recruiter, Michael Kane, and assigned him the task of contacting Hutchinson and proposing that he come to work for Epsilon. Kane interviewed Hutchinson and reported back to Penzell that Hutchinson was willing to speak with Epsilon.

When deposed, Hutchinson admitted that he had spoken to Kane, who told him that he would pass on the information to Penzell. During a phone call from Penzell, Hutchinson shared with him the same issues he had discussed with Kane—his qualifications, experience, and his concerns with CTI. During the call, Hutchinson also expressed his concern about the non-solicitation agreement he had signed with CTI. Hutchinson scanned and emailed a copy of the agreement to Epsilon for its lawyers to review. When the call with Penzell ended, Hutchinson was left with the "understanding that this was not necessarily a simple situation," but that they would continue to talk about the possibility of hiring.

Hutchinson went on to testify that the next time he spoke with Penzell, Penzell informed him that the non-solicitation agreement was "laughable" and Epsilon would pay his legal fees if necessary. Penzell then asked Hutchinson if there were other disaffected CTI employees on the JCAC contract. Hutchinson named Stone, Fleming, and Bernard, who were experiencing the same frustrations working for CTI. Hutchinson could not remember how that call with Penzell ended, but he estimated that between their first conversation and when he received an offer of employment from Epsilon, he spoke to Penzell no less than ten times. Hutchinson estimated that he had been a part of about a dozen "personal conversations" with Stone, Fleming, and Bernard concerning potential employment with Epsilon.

Jasper Stone testified in deposition that he first spoke to Keith Pabst about his complaints with CTI in October 2013, and related that the others—Hutchinson, Bernard, and Fleming—all had the same complaints. He stated he had looked to Paul Hutchinson for guidance, as the JCAC job was his first government

4

contract, and the two talked together with Pabst. According to Stone, Pabst told them he would get in touch with Dands and would let them know the result of the conversation. Stone admitted that in November 2013, he was involved in a four-way conversation between himself, Hutchinson, Fleming, and representatives from Epsilon on their personal cell phones outside the building where they were working for CTI. He said Pabst had asked him "in passing" if he would be interested in working for Epsilon. Stone brought up the non-solicitation agreement and Pabst ended the conversation there. Stone then testified that it was Hutchinson who told him that Penzell wanted to have a phone conversation with them concerning employment. Stone again raised the non-solicitation clause and was told by Hutchinson that it was not they who were doing the soliciting; it was Epsilon who had initiated contact with them as a group and was interested in talking about employment. Stone maintained that it "might be hard to prove where the first contact came from," but insisted it "definitely" had been Epsilon soliciting them for employment. What ultimately eased his mind was his conversation with Penzell, who informed him Epsilon's general counsel had advised him that Florida law would not recognize the non-solicitation agreement because Florida is a "right to work" state and it had been Epsilon who had solicited them.

In early to mid-November 2013, Penzell asked Gaukel to reach out to Appellees for their contact information in order that he could speak to them directly about employment with Epsilon. By November 25, 2013, Penzell, himself, contacted Hutchinson, Stone, and Fleming and conveyed an offer of employment with Epsilon on the JCAC project. Penzell interviewed them, and all three discussed their work experience as CTI employees on the JCAC contract, while voicing their concerns with CTI. Penzell allayed their fears that CTI would take legal action against them for leaving its employ and going to work for Epsilon, but, again, assured them that Epsilon would pay their attorney's fees in the event of a lawsuit.

Hutchinson, Stone, and Fleming each expressed their willingness to accept employment with Epsilon. In his affidavit, Penzell said he explained to them that a formal written job offer would be conditioned on their being able to receive updated

5

security clearances from the U.S. government. To obtain the updates, Hutchinson, Stone, and Fleming would have to provide Epsilon with updated "packages" for Standard Form 86—the Questionnaire for National Security Positions ("SF 86"). Epsilon provided the three men with the SF 86 clearance materials and coordinated their submission for forwarding to the government. No other documents, such as resumes, applications, or other personnel forms, were required of Appellees before they started work with Epsilon.

The last remaining CTI employee to be officially contacted by Epsilon was Kurt Bernard. It was in late November 2013 when Gaukel asked him about coming on board. Bernard said he was interested and would be willing to speak with Penzell. Gaukel informed Penzell of Bernard's response, but because Bernard did not hear from Penzell by early December, he contacted Fred Luke, a friend employed by Epsilon. Bernard explained to Luke that Gaukel had approached him about a job and asked Luke if he knew anything about the offer. Luke said he did not, but would check on the status of the matter. He subsequently informed Bernard that Bernard would be receiving a call soon.

When Bernard did not hear from Penzell by December 20, Luke suggested he call or convey his contact information. Bernard did the latter and Penzell called him, apologizing for not calling sooner. Penzell confirmed Epsilon's offer of employment to him and informed him Gaukel had been personally authorized by him to offer him a job with Epsilon. Nevertheless, during the conversation, Penzell directly indicated he would like to hire Bernard and advised him his job would be conditioned upon Epsilon's receipt of Bernard's updated SF 86 clearance. Epsilon staff members facilitated the paper work for Bernard, as it had done for the other three Appellees.

Jasper Stone was the first to begin working as an instructor in support of the JCAC contract for Epsilon, on January 17, 2014. Then, in February 2014, a "meet and greet" was held in Pensacola in order for Penzell to meet Appellees. Although Michael Fleming attended, he later flatly denied that there was any discussion about transitioning his employment to Epsilon during the gathering. Instead, he said the evening was for socializing, and

6

later in the evening, they were joined by other Epsilon employees. Nevertheless, in March 2014, <u>Fleming</u>, along with Hutchinson and Bernard, resigned their positions with CTI and became employed by Epsilon as JCAC instructors.

## II.

On June 3, 2014, CTI filed a complaint against Appellees to have the non-solicitation agreements enforced and treated as non-compete agreements, to enjoin Appellees from working for Epsilon or any other company associated with the federal government contract, and to recover damages for breach of contract. Appellees filed a motion for summary judgment on June 27, 2015. On September 9, the trial court entered a partial summary judgment in favor of Appellees on CTI's claim of breach of non-compete agreements, but found genuine issues of material fact remained on the question of the enforceability of the non-solicitation agreements, entitlement to relief and damages for breach of contract, and Appellees' affirmative defenses.

A hearing was held on the remainder of Appellees' motion for summary judgment on November 6, 2017, at which time the parties presented their arguments. Ultimately, the trial court granted Appellees' motion. In its Decision and Order Granting Motion for Summary Judgment, the trial court ruled:

> [T]here is no genuine issue of material fact or law and [] the evidence presented in the record before the Court clearly shows that Epsilon solicited these Defendants, and not the converse. Defendants responded and eventually accepted offers from Epsilon. Defendants' conduct was what would be characterized as the normal job application processing for the job of an instructor on the JCAC Contract. Defendants' actions, as reflected in this case, were simply in response to Epsilon's offer of employment and were the process they had to go through to accept the job. Because Defendants did not engage in any proactive solicitation, although Epsilon did, Defendants did not violate or breach their non-solicitation agreements.

Pivotal to its decision was the trial court's rejection of CTI's argument that *Scarbrough v. Liberty National Life Insurance Co.*, 872 So. 2d 283 (Fla. 1st DCA 2004), controlled and, under that opinion's analysis, that Appellees had engaged in sufficiently "proactive" conduct to constitute a breach of the non-solicitation agreements, regardless of who made the first contact. Instead, the trial court found "instructive and persuasive" the decision of the Indiana Court of Appeals in *Enhanced Network Solutions Group, Inc. v. Hypersonic Technologies Corp.*, 951 N.E.2d 265 (Ind. Ct. App. 2011), which distinguished its facts from the proactive conduct in *Scarbrough*. Applying the Indiana appellate court's analysis to the facts in the instant case, the trial court concluded there was "no genuine issue of material fact or law" and "the record clearly shows that Epsilon solicited these Defendants, and not the converse." For the reasons that follow, we respectfully disagree with the trial court's conclusion.

## III.

An order granting summary judgment is reviewed de novo. *Volusia Cty. v. Aberdeen at Ormond Beach, L.P.*, 760 So. 2d 126, 130 (Fla. 2000).

> The law is well settled in Florida that a party moving for summary judgment must show conclusively the absence of any genuine issue of material fact and the court must draw every possible inference in favor of the party against whom a summary judgment is sought. . . . A summary judgment should not be granted unless *the facts are so crystallized* that nothing remains but questions of law. . . .

> If the evidence raises any issue of material fact, if it is conflicting, *if it will permit different reasonable inferences*, or if it tends to prove the issues, it should be submitted to the jury as a question of fact to be determined by it. . . .

*Moore v. Morris*, 475 So. 2d 666, 668 (Fla. 1985) (emphasis added) (citations omitted). As this Court accentuated in *Bowman v. Barker*, 172 So. 3d 1013 (Fla. 1st DCA 2015):

> A summary judgment proceeding *is not a trial by affidavit or deposition. . . .* The movant must demonstrate conclusively that no genuine issue exists as to any material fact, and the court must draw every possible inference in favor of the party opposing summary judgment. . . . Moreover, "[A]ll doubts as to the existence of a genuine issue of material fact must be resolved against the moving party; *if the slightest doubt remains,* a summary judgment cannot stand."

*Id.* at 1015 (emphasis added) (citations and some quotation marks omitted) (quoting *Brock v. Assocs. Fin., Inc.*, 625 So. 2d 135, 135-36 (Fla. 1st DCA 1993)).

As we earlier remarked, the trial court resolved the question of who initiated solicitation as a matter of law by concluding that *Enhanced Network Solutions Group*—not *Scarbrough*—compelled the conclusion that Appellees did not proactively solicit employment with Epsilon. We appreciate the trial court's attempt to parse the legal issue central to *Scarbrough* by comparing it to an out-of-state appellate court's critique of our analysis, but *Scarbrough* is the controlling precedent in the First District and the trial court was bound to apply it. *Pardo v. State*, 596 So. 2d 665, 666 (Fla. 1992) (holding that "'[t]he decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by this Court,'" quoting *Stanfill v. State*, 384 So. 2d 141, 143 (Fla. 1980)). Even so, because the trial court felt compelled to locate another court's decision presenting different facts in order to distinguish those in *Scarbrough* exemplifies just how fact-driven this particular case is.

Initially, it is important to note that neither *Scarbrough* nor *Enhanced Network Solutions Group* were decided on motions for summary judgment. *Enhanced Network Solutions Group* involved an appeal from the trial court's order granting a declaratory judgment. The Indiana appellate court restated the issue as being "[w]hether the trial court erred when it found that Hypersonic did not solicit or induce an employee of ENS to terminate his employment in violation of the terms of the Sub-Contractor Agreement entered into between Hypersonic and ENS." 951 N.E.2d at 266. The appellate court reviewed the trial court's

9

findings to determine whether they were supported by the evidence and also "considered only the evidence favorable *to the judgment* and all reasonable inferences to be drawn therefrom." *Id.* at 267 (emphasis added) (citations omitted). That standard of review clearly differs from the one we must employ in reviewing the instant summary judgment order, where every possible inference must be resolved in favor of CTI, the party opposing summary judgment. *Brookie*, 213 So. 3d at 1131.

In turn, *Scarbrough* was an appeal from an order temporarily enjoining Scarbrough from soliciting the sale of insurance to customers of Liberty National Life Insurance, Scarbrough's former employer. Again, the standard of review differed. On appeal, it was whether the trial court abused its discretion. But apart from that, in *Scarbrough* we adopted the definition of "solicit" from *Black's Law Dictionary* to be applied to non-solicitation cases. We concluded that "[i]t reasonably appears [] that a person may, in appropriate circumstances, solicit another's business regardless of who initiates the meeting" because "the term 'solicit' in an agreement prohibit[s] the employee from being 'proactive' in such efforts." *Id.* at 285 (citing *J.K.R., Inc. v. Triple Check Tax Serv.*, 736 So. 2d 43, 44 (Fla. 1st DCA 1999)). As a result, *Scarbrough* expanded the concept of direct solicitation to encompass conduct that, while less direct, is nonetheless more active than passive in nature.

We conclude that whether a defendant's behavior is proactive presents a question of fact for the trier of fact. Indeed, the question of whether Appellees were "proactive" in soliciting employment with Epsilon is just as unsuitable for resolution on a motion for summary judgment as was the fraud claim in *Bowman,* for the reason that it is "a subtle thing requiring a full explanation of the facts and circumstances of the alleged wrong[.]" 172 So. 3d at 1017 (internal quotation marks omitted) (quoting *Palmer v. Santa Fe Healthcare Sys., Inc.*, 582 So. 2d 1234, 1236 (Fla. 1st DCA 1991)).

For instance, in the present case, the essence of Hutchinson's deposition testimony and Gaukel's affidavit draws forth the reasonable inference that Hutchinson, along with the other Appellees, might have been complaining just a little too loudly about employment woes with CTI in a working environment where

10

everyone involved knew there was more than one subcontractor on the job to hear their protests. Furthermore, Hutchinson's round-up of the other three Appellees also is subject to a reasonable inference that there might have been a concerted plan to leave CTI for Epsilon. And, Penzell's act of referring the issue of the non-solicitation agreements to his company's legal team because of concerns expressed by Appellees suggests a general acknowledgment of a potential conflict with the agreements, despite Penzell's disparaging opinion that CTI's non-solicitation clauses were "laughable." Those facts, alone, go a long way toward "permit[ing] different reasonable inferences," and, moreover, they "tend[] to prove the issues." *Moore*, 475 So. 2d at 668.

It is also worth noting that this is not a case where the issue is resolved based on the interpretation of the contractual language, or turns on the enforceability of the non-solicit/non-compete clause. *Cf. White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774 (Fla. 2017); *Henao v. Prof'l Shoe Repair, Inc.*, 929 So. 2d 723 (Fla. 5th DCA 2006); *Univ. of Fla., Bd. of Trs. v. Sanai*, 837 So. 2d 512 (Fla. 1st DCA 2003). Instead, whether the terms of the non-solicitation agreements were violated here is largely predicated on the inferences to be drawn from the facts of Appellees' behavior prior to, and during, their negotiations with Epsilon. On that point, we hold that the facts contained in the depositions, affidavits, and other papers of record are not "so crystallized that nothing remains but questions of law." *Moore*, 475 So. 2d at 668. Instead, they raise a legitimate doubt so that "'a summary judgme*nt cannot stand . . . .'" Bowman*, 172 So. 3d at 1015 (emphasis added) (quoting *Brock*, 625 So. 2d at 135–36).

Consequently, the Decision and Order Granting Motion for Summary Judgment is reversed and the cause is remanded for further proceedings on CTI's Amended Complaint.

REVERSED and REMANDED.

MAKAR, OSTERHAUS, and JAY, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____


Jeremy C. Branning, Daniel E. Harrell, and Andrew M. Spencer of Clark Partington, Pensacola, for Appellant.

Ralph A. Peterson, Marcus A. Huff, and John R. Zoesch, III, of Beggs & Lane, RLLP, Pensacola, for Appellees.